1   BRYAN WILSON (CA SBN 138842)
    BWilson@mofo.com
2   ALESSA YIN-CHEN PHANG (CA SBN 286872)
    APhang@mofo.com
3   MORRISON & FOERSTER LLP
    755 Page Mill Road
4   Palo Alto, California  94304-1018
    Telephone: 650.813.5600
5   Facsimile: 650.494.0792

6   SCOTT F. LLEWELLYN (CA SBN 194553)
    SLlewellyn@mofo.com
7   MORRISON & FOERSTER LLP
    5200 Republic Plaza
8   370 Seventeenth Street
    Denver, Colorado  80202-5638
9   Telephone: 303.592.1500
    Facsimile: 303.592.1510
10
    WHITNEY E. MCCOLLUM (CA SBN 253039)
11  WMcCollum@mofo.com
    MORRISON & FOERSTER LLP
12  425 Market Street
    San Francisco, California  94105-2482
13  Telephone: 415.268.7000
    Facsimile: 415.268.7522
14
    Attorneys for Plaintiff
15  NALCO COMPANY

16

17                     UNITED STATES DISTRICT COURT

18                    NORTHERN DISTRICT OF CALIFORNIA

19

20
    NALCO COMPANY,                          Case No.    3:13-cv-02727 NC
21
                        Plaintiff,          **PLAINTIFF NALCO**
22                                          **COMPANY'S OPENING CLAIM**
          v.                                **CONSTRUCTION BRIEF**
23
    TURNER DESIGNS, INC.,                   Date:     June 11, 2014
24                                          Time:     2:00 p.m.
                        Defendant.          Ctrm:     Courtroom A, 15th Floor
25                                          Magistrate Judge Nathanael Cousins

26

27

28

NALCO'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. C3:13-CV-02727-NC
   pa-1634719

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     FACTUAL BACKGROUND ...................................................................................... 2

        A.      Plaintiff Nalco Company.................................................................................. 2

        B.      Defendant Turner Designs, Inc. ...................................................................... 2

        C.      U.S. Patent No. 6,255,118............................................................................... 3

III.    CLAIM CONSTRUCTION LEGAL STANDARDS .................................................. 6

        A.      Claims require no construction when they are not unfamiliar or confusing
                to the jury, or affected by the intrinsic evidence........................................... 6

        B.      If construction is necessary, there is a heavy presumption that claim terms
                should be accorded their plain and ordinary meaning ................................... 7

        C.      Claims should be construed according to the intrinsic evidence, including
                the specification and the file history. ............................................................. 7

        D.      Claims should be accorded their plain and ordinary meaning unless the
                patentee expressed a "clear" and "explicit" intent to redefine the term................ 8

        E.      To the extent construction is necessary, it is improper to import limitations
                from the specification into the claims. ........................................................... 8

IV.     THE '118 PATENT TERMS ....................................................................................... 9

        A.      "sample chamber which is a cell" .................................................................... 9

                1.      "Sample chamber" and "cell" are common and ordinary words that
                        need no construction .......................................................................... 9

                2.      The specification, claims, and prosecution history all use the plain
                        and ordinary meaning of the term .................................................... 10

                3.      Turner's proposed construction improperly imports extraneous
                        limitations into the claim.................................................................. 13

                4.      Nalco's proposed alternative construction is consistent with the
                        specification and intrinsic evidence. ............................................... 15

        B.      "programming said fluorometer to produce an output signal proportional to
                the detected fluorescence"............................................................................. 16

                1.      "Programming" is a common and ordinary word that needs no
                        construction. ..................................................................................... 16

                2.      The specification, claims, and prosecution history show that
                        "programming" has a plain and ordinary meaning ................................. 17

**TABLE OF CONTENTS**
**(continued)**

Page

3.  Turner's proposed construction improperly imports extraneous limitations into the claim............................................................................ 18

4.  If claim construction is necessary, Nalco's construction is consistent with the intrinsic evidence. ...................................................... 20

C.  "emitting light having a wavelength of from about 370 nm to 500 nm" .............. 21

1.  The phrase "emitting light having a wavelength of from about 370 nm to about 500 nm" needs no construction............................................ 21

2.  The specification, claims, and prosecution history show that "of from about 370 nm to 500 nm" should have its ordinary meaning.......... 22

3.  Turner's proposed construction improperly imports extraneous limitations into the claim............................................................................ 23

4.  If the Court finds it necessary to construe the terms, Nalco's construction is consistent with the specification...................................... 25

V.  CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agfa Corp. v. Creo Prods. Inc.*,
451 F.3d 1366 (Fed. Cir. 2006)................................................................ 15, 20

*Andersen Corp. v. Fiber Composites, LLC*,
474 F.3d 1361 (Fed. Cir. 2007)....................................................................... 7

*Applied Sci. & Tech., Inc. v. Advanced Energy Indus., Inc.*,
204 F. Supp. 2d 712 (D. Del. 2002)............................................................... 14

*Aventis Pharms. Inc. v. Amino Chems. Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013)............................................................. 7, 15, 20

*Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
528 F. Supp. 2d 967 (N.D. Cal. 2007), ................................................... *passim*

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002)............................................................. 7, 15, 20

*Comark Commc'ns, Inc. v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998)....................................................................... 8

*Dorel Juvenile Grp., Inc. v. Graco Children's Prods., Inc.*,
429 F.3d 1043 (Fed. Cir. 2005)................................................................ 19, 24

*Elcommerce.com, Inc. v. SAP AG*,
745 F.3d 490 (Fed. Cir. 2014)........................................................................ 23

*Enercon GmbH v. Int'l Trade Comm'n*,
151 F.3d 1376 (Fed. Cir. 1998)...................................................................... 12

*Energy Transp. Grp., Inc. v. William Demant Holding A/S*,
697 F.3d 1342 (Fed. Cir. 2012)................................................................ 19, 21

*Harris Corp. v. IXYS Corp.*,
114 F.3d 1149 (Fed. Cir. 1997)........................................................................ 6

*Hoganas AB v. Dresser Indus, Inc.*,
9 F.3d 948 (Fed. Cir. 1993)................................................................. 8, 14, 24

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001)................................................................ 17, 24

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999)................................................................ 12, 20

*Kapusta v. Gale Corp.*,
  155 Fed. Appx. 518 (Fed. Cir. 2005) ..................................................................... 12

*Laitram Corp. v. NEC Corp.*,
  163 F.3d 1342 (Fed. Cir. 1998) ................................................................... 8, 14, 24

*Med. Research Inst. v. Bio-Engineered Supplements & Nutrition, Inc.*,
  No. 605 CV 417, 2007 U.S. Dist. LEXIS 3576 (E.D. Tex. Jan. 12, 2007) ............................ 22

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ..................................................... *passim*

*Renishaw PLC v. Marposs Societa Per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) .................................................................. *passim*

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001) ........................................................................ 15

*SciMed Life Sys., Inc. v. Advanced Cardio. Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) ......................................................................... 8

*Sjolund v. Musland*,
  847 F.2d 1573 (Fed. Cir. 1988) ................................................................... 8, 14, 24

*Superguide Corp. v. DirectTV Enters., Inc.*,
  358 F.3d 870 (Fed. Cir. 2004) ......................................................................... 14

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ..................................................................... 8, 19

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) .................................................................. 6, 9, 22

*Yodlee, Inc. v. Cashedge, Inc.*,
  No. C 05-01550 SI, 2006 WL 1883342 (N.D. Cal. July 7, 2006) ....................................... 6, 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      INTRODUCTION

Plaintiff Nalco Company is the inventor and leading worldwide supplier of technology and equipment for chemical monitoring, detection, and treatment of industrial water systems, which it sells under the brand name "TRASAR."  The patent-in-suit is one of many Nalco patents that cover various aspects of the TRASAR process.  In very general terms, the TRASAR process uses a fluorometer to detect the concentration of fluorescent molecules in an industrial water system to determine the amount of a desired water treatment chemical that is present.  The level of the water treatment chemicals in the system is then adjusted accordingly.  The chief innovation of the patent-in-suit, U.S. Patent No. 6,255,118 ("the '118 Patent") is to use solid state technology (i.e., an LED light source and a silicon photodiode detector) in this process.

Nalco taught defendant Turner Designs, Inc. ("Turner") about this patented process. Turner has supplied Nalco with fluorometers since 1996, and has been privy to a great deal of information about the TRASAR process through this long-term supply relationship with Nalco. In 2002, however, after a competitive bidding process, Nalco selected another company to manufacture fluorometers for use with its TRASAR technology.  Based apparently on the belief that all of Nalco's patents had expired, Turner recently began selling fluorometers to companies who use them in Nalco's patented process, but who do not purchase products or services from Nalco.

The '118 Patent is clearly written.  There are only three disputed claim terms.  These terms involve common, ordinary words which can be understood by a juror and need no construction.  If construction is necessary, Nalco believes each disputed term should be construed according to its plain and ordinary meaning, consistent with Federal Circuit guidance.  Turner, on the other hand, advocates complicated constructions that are designed to advance its non-infringement case.  Turner's constructions are not supported by the patent or the prosecution history, often directly contradicting them, and would change the claim limitations rather than clarify them.

## II.     FACTUAL BACKGROUND

### A.     Plaintiff Nalco Company

Nalco is a worldwide supplier of water, energy and air improvement solutions and services for industrial and institutional markets.  Nalco sells products and services designed to reduce consumption of energy, water, and other natural resources, enhance air quality, minimize environmental releases, and improve productivity and efficiency.  Nalco is recognized as an industry leader in the industrial water treatment market.  (Declaration of Bryan Wilson in Support of Plaintiff Nalco Company's Opening Claim Construction Brief ("Wilson Decl.") Ex. A.)

Particularly well-known in the industry is Nalco's 3D TRASAR technology, which refers to system-wide monitoring, detection, and treatment of water in industrial cooling towers and boilers, among other things.  (*Id.* Ex. B.)  Nalco's 3D TRASAR system measures key system parameters, detects upsets in the system, and takes corrective action to maximize operating efficiency and protect system components.  This reduces water use, because the water can be treated instead of being drained and replaced.

The success of 3D TRASAR is based on decades of research and innovation by Nalco scientists.  For example, John Hoots, the inventor of the TRASAR concept, holds many patents on various aspects of TRASAR, including the '118 Patent and two of the patents that are incorporated by reference into the '118 Patent.  The '118 Patent is an improvement on these concepts, and is based on a novel, pioneering approach that applies solid state technology to Nalco's TRASAR system.  (*See* '118 Patent, 5:20-25.)

### B.     Defendant Turner Designs, Inc.

Defendant Turner manufactures and sells fluorometers for environmental and industrial uses.  Turner has supplied Nalco with various fluorometers from 1996 until 2013.  Turner acknowledges that it has been aware of the '118 Patent since shortly after it was issued.  (Wilson Decl. Ex. D at Interrogatory No. 7.)

In 2002, Nalco requested bids to produce a new industrial on-line fluorometer and controller for a process using the new solid state technology.  Turner bid on the project, in partnership with its current customer Walchem Iwaki America ("Walchem"), but the bid was not

1    selected.

2           In discussions relating to the bid for the new on-line fluorometer, Nalco disclosed to

3    Turner the details of its patented idea for using a solid date fluorometer in the TRASAR process.

4    In 2003, during its discussions with Nalco, Turner filed its own provisional patent application on

5    a fluorometer that uses solid state technology.  This provisional application eventually led to

6    Turner's Patent No. 7,099,012 ("'012 Patent") that Turner claims covers the accused product,

7    which is known as the "Little Dipper."  (Turner marks the Little Dipper with the '012 Patent

8    number.  (Wilson Decl. Ex. E).)  Entitled "In-Line Spectrometer," the '012 Patent claims to cover

9    a "fluorometer for measuring fluorescence of a non-solid material flowing through a system of

10   pipes." ('012 Patent, 8:44-46.)  In the course of the patent prosecution, the Patent Office rejected

11   Turner's proposed claims based on prior art.  Turner responded that the use of solid state

12   technology was novel, and therefore different from the prior art.  (Wilson Decl. Ex. F at 47-48.)

13   The Patent Office rejected this claim as obvious because Nalco's '118 Patent had already

14   described the use of solid state technology.  (*Id.* at 25.)  Turner overcame this rejection by

15   specifying that the invention in the '012 Patent would have threads to connect a T connector to

16   the body of the fluorometer.  (*Id.* at 16.)  Not surprisingly, Turner sells its Little Dipper

17   fluorometers to customers who want to implement a generic version of Nalco's 3D TRASAR

18   process.  (*Id.* Ex. G, Brumett Dep. 72:9-16.)

19          Turner never told Nalco that it was applying for its own patent.  Since it began selling the

20   Little Dipper, however, Turner has told customers that it specifically designed the Little Dipper to

21   avoid infringing the '118 Patent.  Turner has been telling potential customers that use of the

22   Little Dipper does not infringe the '118 Patent because the Little Dipper does not have a "flow

23   cell." (*Id.* Ex. H.)

24                      **C.      U.S. Patent No. 6,255,118**

25          The application that led to the '118 Patent was filed on December 31 1998, and the patent

26   issued on July 3, 2001.  The '118 Patent is designed to fill the need for "an all solid-state

27   fluorometer including a system and method for the use of such a fluorometer for monitoring the

28   concentration of fluorescent tracer molecules particularly in industrial water systems." ('118

1   Patent, 2:31-35.)

2        Fluorescence is a property of some molecules to absorb light at a first wavelength, and

3   emit light at a second, different wavelength.  (Wilson Decl. Ex. I.)  Fluorometry is the

4   measurement of fluorescence using an instrument like a fluorometer.  (*See generally* '118 Patent,

5   6:45-53.)  A fluorometer functions by directing light at a sample (industrial water, in the case of

6   the patent) at the first wavelength chosen to excite specific molecules in the sample.  (*Id.*)  The

7   excited molecules then emit light at the second wavelength, which is received by the detector.

8   ('118 Patent, 2:43-48, 2:47-52.)  Using this principle, the light emitted by the sample can be

9   measured and correlated to the concentration of the molecule in the sample.  ('118 Patent, 2:43-

10  48.)  The fluorometer is then configured to convert the raw signal to an electric current which is

11  readable by a controller and sent from the fluorometer to the controller.  In the case of the

12  patented process, the specific molecule is a tracer chemical that will fluoresce at the appropriate

13  wavelength, and will remain in the system in amounts proportional to the treatment chemical of

14  interest.  ('118 Patent, 5:11-56.)

15       The prior art discloses the use of fluorescent monitoring of fluorescent tracer species in

16  industrial processes, but it does not teach the use of an all solid-state fluorometer for this purpose.

17  ('118 Patent, 4:47-50.)  Prior art fluorometers used for industrial processes were based on gas-

18  lamp excitation sources and photomultiplier tube detectors which were large, unwieldy, and

19  needed high current, high voltage power supplies.  ('118 Patent, 2:24-35.)

20       The present invention addressed, and solved, these problems by teaching the use of solid-

21  state fluorometers in industrial water processes.  Solid-state fluorometers are different from other

22  types of fluorometers in that they use diode laser-based or light-emitting diode-based (LED)

23  components unconventionally as novel ultraviolet (UV) light sources.  ('118 Patent, 5:20-25,

24  8:17-19.)  For the detector, they use silicon photodiodes instead of photomultiplier tubes.  ('118

25  Patent, Abstract, 2:24-27.)  By using solid-state technology, the invention provides extremely

26  high reliability, with operating lifetimes longer than those of the old technology using gas

27  discharge lamps.  ('118 Patent, 8:38-39.)  Among other things, the solid-state nature of these

28  components simplifies the fluorometry design and minimizes assembly costs.  ('118 Patent, 8:43-

45, 10:40-44.)

Claim 1, the only independent claim in the '118 Patent, is reproduced below with the disputed terms italicized and in bold:

1. A method for monitoring concentration of chemicals in industrial water systems, the method consisting essentially of the steps of:

(a) providing a solid-state fluorometer, wherein said fluorometer comprises:

i). a solid state excitation source to direct light in a specified direction, wherein said excitation source is either a light emitting diode, with said light emitting diode emitting light having a wavelength *of from about 370 nm to about 500 nm*, or a solid state diode laser having an integral photodiode, with said laser emitting light having a wavelength of from about 635 nm to about 1600 nm;

ii). A detector receiving the fluorescence from the excitation of the sample and producing an output signal proportional to the quantity of fluorescence received on the detector, wherein said detector is a silicon photodiode;

iii). *A sample chamber which is a cell*, where the entrance of the cell is not covered by a species-selective membrane;

(b) providing an industrial water system, where a chemical treatment or additive has been added to said industrial water system, wherein a fluorescent tracer is present in said chemical treatment or additive in a known proportion to said chemical treatment or additive;

(c) using said fluorometer to detect the fluorescence of the fluorescent tracer in the industrial water system;

(d) *programming said fluorometer to produce an output signal proportional to the detected fluorescence*; and

(e) controlling dosage of chemical treatments or additives to the industrial water system based on the concentration of fluorescent tracer detected by said fluorometer.

The specification provides information relevant to all three disputed terms. For example, regarding Claim 1(a)(i) relating to wavelength, the specification explains that "of from about 370 nm to about 500 nm" is an approximate range of wavelengths in the near-UV spectrum ('118 Patent, 8:19-23). The specification further explains that the specific wavelength chosen from within this range depends on the specific fluorophore to be excited. For example, the specification discusses how emissions of 380 – 390 nm can be used to excite a specific fluorophore (commonly known as PTSA) that is used in the TRASAR process. ('118 Patent,

1    8:30-35.)

2          With respect to Claim 1(a)(iii), the specification consistently uses the terms "cell" or

3    "sample cell" to describe a space or location containing the sample when its fluorescence is

4    measured.  ('118 Patent, 8:60-65; 9:7-10; 2:59-61.)  This "cell" is a general location between the

5    detector and the light source containing the sample being measured.  ('118 Patent, Fig. 5.)

6          Finally, Claim 1(d) says the programming step is done to produce an output signal

7    proportional to the detected fluorescence.  The specification describes multiple ways to do this,

8    all of which involve selecting appropriate electronic components such as amplifiers and resistors.

9    ('118 Patent, Abstract, 5:41-56, 2:62-65.)

10         **III.    CLAIM CONSTRUCTION LEGAL STANDARDS**

11              **A.    Claims require no construction when they are not unfamiliar or
                confusing to the jury, or affected by the intrinsic evidence.**

12

13         Not all claims require construction.  Claim construction should be conducted with its

14   purpose squarely in mind: to "clarify and *when necessary* to explain what the patentee covered by

15   the claims . . . .  [Claim construction] is not an obligatory exercise in redundancy."  *U.S. Surgical*

16   *Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (emphasis added).  If a term is not

17   "unfamiliar to the jury, confusing to the jury, [or] affected by the specification or prosecution

18   history," no construction is necessary.  *Bd. of Trustees of the Leland Stanford Junior Univ. v.*

19   *Roche Molecular Sys., Inc.*, 528 F. Supp. 2d 967, 976 (N.D. Cal. 2007), *aff'd in part, vacated in*

20   *part* (on other grounds) (holding that the terms "therapeutically," "effective," and "ineffective"

21   are all familiar words which need no construction).  Where the meaning of claim language is clear

22   from the context, "[c]onstruing [the term] is thus unnecessary."  *See Yodlee, Inc. v. Cashedge,*

23   *Inc.*, No. C 05-01550 SI, 2006 WL 1883342, at *14 (N.D. Cal. July 7, 2006).  Courts should

24   avoid constructions that "contribute nothing but meaningless verbiage to the definition of the

25   claimed invention."  *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997).

26

27

28

1

**B.      If construction is necessary, there is a heavy presumption that claim terms should be accorded their plain and ordinary meaning.**

2

3        On the other hand, if construction is necessary, claim terms normally are accorded their

4    plain and ordinary meaning.  There is a "'heavy presumption' that a claim term carries its

5    ordinary and customary meaning."  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366

6    (Fed. Cir. 2002); *Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir.

7    2013).  By default, a disputed claim term should be construed in a manner consistent with its

8    "ordinary and customary meaning," i.e., "the meaning that the term would have to a person of

9    ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date

10   of the patent application."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en*

11   *banc*).  The ordinary meaning of a term may be determined solely by viewing the term within the

12   context of the claim's overall language.  *See id.* at 1314 ("[T]he use of a term within the claim

13   provides a firm basis for construing the term.").

14

**C.      Claims should be construed according to the intrinsic evidence, including the specification and the file history.**

15

16       It is a "bedrock principle" of patent law that "the claims of a patent define the invention to

17   which the patentee is entitled the right to exclude."  *Id.* at 1312 (citation omitted).  If claims are

18   construed, the Court must construe the claim terms in a manner that they would be understood by

19   a person of ordinary skill in the art as of the effective filing date of the patent application.  *Id.* at

20   1313.  If construction is necessary, courts should first examine the intrinsic evidence, including

21   the claims, specification, and relevant file history.  *See id.* at 1314; *Andersen Corp. v. Fiber*

22   *Composites, LLC*, 474 F.3d 1361, 1368 (Fed. Cir. 2007).  "The construction that stays true to the

23   claim language and most naturally aligns with the patent's description of the invention will be, in

24   the end, the correct construction."  *Phillips*, 415 F.3d at 1316.  Moreover, the specification is the

25   best source for understanding a term, informed, as needed, by the prosecution history.  *Id.*

26

27

28

1

D.     **Claims should be accorded their plain and ordinary meaning unless the patentee expressed a "clear" and "explicit" intent to redefine the term.**

2

3      There are some exceptions to the general rule that claim terms should be left to their plain

4      and ordinary meaning, for example, (1) "when a patentee sets out a definition and acts as his own

5      lexicographer, or" (2) "when the patentee disavows the full scope of a claim term either in the

6      specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362,

7      1365 (Fed. Cir. 2012) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir.

8      1996)).  To act as his own lexicographer, a patentee must "clearly set forth a definition of the

9      disputed claim term" other than its plain and ordinary meaning.  *Id.*  "It is not enough for a

10     patentee to simply disclose a single embodiment or use a word in the same manner in all

11     embodiments, the patentee must 'clearly express an intent' to redefine the term." *Id.* (citations

12     omitted).

13

E.     **To the extent construction is necessary, it is improper to import limitations from the specification into the claims.**

14

15     Moreover, a construction is improper if it imports limitations from the specification into

16     the claims.  Although ordinary meaning may be ascertained through the specification, "it does not

17     follow that limitations from the specification may be read into the claims." *Comark Commc'ns,*

18     *Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).  In limited circumstances, the

19     specification may be used to narrow the meaning of a claim term, *e.g.*, where the specification

20     makes clear the invention does not include a particular feature, when the patentee acts as her own

21     lexicographer, or intentionally disavows claim scope. *See SciMed Life Sys., Inc. v. Advanced*

22     *Cardio. Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001); *Phillips*, 415 F.3d at 1316.  However,

23     claim terms may not be construed to impose limitations not found in the claims or not supported

24     by an unambiguous restriction in the specification or prosecution history. *Laitram Corp. v. NEC*

25     *Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998).  It is improper to add "extraneous" limitations to a

26     claim "wholly apart from any need to interpret what the patentee meant by particular words or

27     phrases in the claim." *Hoganas AB v. Dresser Indus, Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993);

28     *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988).

## IV.    THE '118 PATENT TERMS

### A.    "sample chamber which is a cell"

Claim 1 describes a solid-state fluorometer that comprises, among other things, "a sample chamber which is a cell, where the entrance to the cell is not covered by a species-selective membrane." ('118 Patent, 12:1-3 (emphasis added).)  The parties' proposed claim constructions for this term, as stated in the Joint Claim Construction Statement, are as follows:

| Claim Term | Nalco's Proposed Construction | Turner's Proposed Construction |
|---|---|---|
| A sample chamber which is a cell | No construction.<br><br>Or if construction is necessary, a bounded space containing the sample when fluorescence occurs | A transparent vessel for sample analysis |

### 1.    "Sample chamber" and "cell" are common and ordinary words that need no construction.

The term "a sample chamber which is a cell" requires no construction.  Claim construction should be done with its purpose squarely in mind: to "clarify and *when necessary* to explain what the patentee covered by the claims." *U.S. Surgical*, 103 F.3d at 1568 (emphasis added).  Here, no construction is needed, because the disputed term is "neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history." *Bd. of Trustees*, 528 F. Supp. 2d at 976 (holding that the terms "therapeutically," "effective," and "ineffective" are all familiar words which need no construction).

The jury will be familiar with, and not confused by, the term (1) "chamber," e.g. chamber of the heart, or a courtroom chamber, (2) the term "cell," e.g., blood cell, honeycomb cell, or prison cell, and (3) the term "sample," as in a blood sample, or DNA sample.  These words are not used with any particular technical meaning here and can be understood and applied from the context of the patent.  Where the meaning of claim language is clear from the context, "[c]onstruing [the term] is thus unnecessary." *See Yodlee, Inc. v. Cashedge, Inc.*, No. 05-01550

SI, 2006 WL 1883342, at *14 (N.D. Cal. July 7, 2006).  General purpose dictionary definitions confirm that these terms are broad terms that are neither complicated nor confusing.[1]

### 2.      The specification, claims, and prosecution history all use the plain and ordinary meaning of the term.

The term "sample chamber which is a cell" is not used in the specification, but "sample" and "cell" are.  A "sample", as used in the patent, is simply a portion of an industrial water stream ('118 Patent, 3:6-7) having a known concentration of molecules to be tested.  ('118 Patent, 2:42-48.)  The term "chamber" does not appear in the specification.  But the specification does reference "cell" separately, and each time, it makes clear that that these terms bear their plain and ordinary meaning within the claim.

The specification uses the word "cell" broadly to describe a space or location containing the sample.  In the context of the claim, a "cell" is simply the place containing the sample so that the LED or laser can shine light onto the sample and the detector can receive the emitted light from the sample.  There is nothing special or particular about the cell.  Figure 5 depicts this relationship clearly ('118 Patent, Fig. 5):

---

[1] **Chamber**: "an enclosed… space designed for some special purpose" (Wilson Decl. Ex. J, Webster's Third New International Dictionary, Unabridged (2014); "a small space inside something" (*id*. Ex. K, Webster's Online Dictionary); "an enclosed space or compartment" (*id*. Ex. L, Webster's II 1995).  **Cell:** "3. a small compartment, cavity, or bounded space" (*id*. Ex. M, Webster's Collegiate Dictionary (11th ed. 2012)); "a small enclosed cavity or space…" (*id*. Ex. L, Webster's II 1995).

# FIG.5



In fact, every mention of the word "cell" in the specification is used broadly to describe a space containing the sample, for example:

- "**Flow cell**" is used to describe a space where the sample stream passes: "A sample stream may contain several fluorescent tracers, and an array of two or more diode lasers of different wavelengths could simultaneously monitor several tracers as the sample stream passes through the *flow cell*." ('118 Patent, 8:60-65 (emphasis added)).

- "**Sample cell**" is used to describe the space where excitation and detection occurs: "Furthermore, an embodiment of the invention in which the excitation and detection of fluorescence occurs from the front surface of the *sample cell* makes it possible to perform measurements in sample streams of high turbidity."  ('118 Patent, 9:7-10).

- "**Sample cell**" is used to describe the space near the photodiode detector: "An optical filter is placed between the sample cell and the photodiode detector to reject scattered laser light." ('118 Patent, Abstract, 2:59-62); "In an embodiment, a filter is constructed and arranged between the sample and the detector to reject scattered excitation light from the sample or *sample cell*."  ('118 Patent, 2:59-62).

1    These examples make clear that "cell" is used broadly in this patent, and is not described

2    with any particular characteristics (e.g. a specific shape, size, structure).  This is precisely because

3    the patent's novel feature is the solid-state technology of the light source and the detector, which

4    can be used with any type of sample chamber or cell.

5    The fact that the word "cell" is used in varied terms throughout the specification

6    (sometimes referring to a "flow cell" and sometimes referring to "sample cell") shows that it is

7    intended to have a broad meaning.  "Varied use of a disputed term in the written description

8    demonstrates the breadth of the term rather than providing a limit[ing] definition."  *Johnson*

9    *Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999) (finding that the term

10   "heading" had no special meaning when the many uses of the term throughout the patent are

11   consistent with a broader definition); *see also Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d

12   1376, 1385 (Fed. Cir. 1998) (refusing to limit a term used interchangeably with another term to

13   only one particular use of the term).

14   As the Federal Circuit has made clear, when a term is claimed broadly without requiring a

15   certain shape, size, or particular attribute, none should be ascribed to it.  *See Renishaw PLC v.*

16   *Marposs Societa Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (holding that an apparatus

17   claim that describes a general structure (e.g. a noun) without limiting it to a specific subset of

18   structures (e.g. with an adjective) must generally be construed to cover *all known types* of that

19   structure) (emphasis added); *accord Kapusta v. Gale Corp.*, 155 Fed. Appx. 518, 521 (Fed. Cir.

20   2005) (refusing to limit "hand-grip size case" to only rectangular shapes).  Here, there is nothing

21   in the specification or the prosecution history that  limits the term "cell" to a certain shape, size,

22   or particular attribute."  Thus, the term "cell" should be given its full and broad scope.

23   Turner's own witnesses confirm that "sample chamber" and "cell" are broad, common

24   terms.  Turner's Rule 30(b)(6) witness, its CEO Jim Crawford, testified that "sample chamber"

25   and "cell" are very broad terms that simply indicate a place containing the sample:

26   Q:    That claim also uses the term "sample chamber." Do you have any
           understanding of what a sample chamber is?

27

28   A:    In a general sense, someplace where the water is that you can see it
           with the fluorometer.

. . .

Q:    In the area of fluorometry that you're familiar with and in which you work, what does the term "cell" mean, if anything?

A:    It would refer to something holding a sample.

. . .

Q:    So when Turner is thinking about whether there's infringement of the '118 Patent, are you reading cell to mean a flow cell?

A:    In this case, they don't specifically say flow cell.  It could be a sample cell.

(Wilson Decl. Ex. C, Crawford Vol. I Dep. 141:23-142:2, 136:5-9, 140:13-17.)  Similarly, Turner's sales engineer, Tom Brumett, who wrote Turner's emails to customers telling them that using the Little Dipper does not infringe the '118 Patent because the Little Dipper does not have a "flow cell," testified that a "sample chamber" is a broad term indicating an area where a sample is taken:

Q.    Do you know what a sample chamber is?

A.    A sample chamber.  Okay.  Yeah it's a pretty broad term an area where sample is taken.

(Wilson Decl. Ex. G, Brumett Dep. 128:23-25.)

    When, as here, the plain meaning, the specification itself, and Turner's own witness testimony show that the terms are common and broad terms, no construction is necessary.  *See Renishaw*, 158 F.3d at 1250.

### 3.    Turner's proposed construction improperly imports extraneous limitations into the claim.

    Turner's proposed construction improperly seeks to narrow the scope of the claim in ways that are inconsistent with the patent and the prosecution history.  Turner proposes that "sample chamber which a cell" should be construed as "a transparent vessel for sample analysis."  Turner takes a very simple, broad claim and narrows it dramatically into a very particular type of structure.

Turner's construction burdens the claim with not one, but two extraneous limitations – "transparent" and "vessel." "Transparent" does not appear anywhere in the claims or the specification. "Vessel" is used only once, to refer to "mixing vessels" during the mixing of ceramic slurries, which is a specific application irrelevant to the claim limitation. ('118 Patent, 9:25-30.) This is improper. As the Federal Circuit has repeatedly made clear, it is improper to add "extraneous" limitations to a claim "wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *Hoganas*, 9 F.3d at 950; *accord Sjolund*, 847 F.2d at 1581; *Laitram*, 163 F.3d at 1347 (claim construction may not impose limitations not found in the claims); *Superguide Corp. v. DirectTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (same).

Indeed, there are many other examples of chambers and cells that are not closed containers, or vessels. As just one example, the '012 Patent, which Turner uses to mark the Little Dipper, describes "chambers" that are "collinear with a pipe" ('012 Patent, 9:42-50). In fact, the '012 Patent shows that a tee[2] (a standard T-shaped pipe component that has an inlet and two outlets) also has a chamber. ('012 Patent, 9:42-45, 5:55-64.) Turner's technical notes likewise notate open chambers where streams of water can flow through. (Wilson Decl. Ex. I, *Turner Designs Technical Note*, 998-0050 Rev. A. at 4, ¶ 3.23.) Consistently with this, at least one court has construed "chamber" broadly to mean a structure with an entrance and an exit. *See Applied Sci. & Tech., Inc. v. Advanced Energy Indus., Inc.*, 204 F. Supp. 2d 712 (D. Del. 2002) (construing the term "plasma chamber" to mean "a structure, with a means for ingress and egress of gases, that contains a plasma.").

Turner's proposed construction is intended to support a non-infringement argument, rather than clarify unfamiliar or confusing language. Even Turner's own witnesses testify that "cell" and "chamber" are broad terms describing the space containing the sample. Turner's overly

---

[2] A standard T-shaped pipe component that has an inlet and two outlets, one outlet in line with the inlet and the other generally at a 90 degree angle to the inlet.

1    narrow construction – unsupported by the intrinsic evidence, plain meaning of the terms, and

2    even Turner itself, should not be adopted.

3              **4.      Nalco's proposed alternative construction is consistent with the
                         specification and intrinsic evidence.**

4

5         If the Court concludes that construction is appropriate, Nalco's construction is consistent

6    with the specification and the claims.  Nalco proposes that "sample chamber which is a cell"

7    should be construed as "a bounded space containing the sample when fluorescence occurs."

8         First, Nalco's construction is consistent with the Federal Circuit's "'heavy presumption'

9    that a claim term carries its ordinary and customary meaning." *CCS Fitness*, 288 F.3d at 1366;

10   *Aventis Pharms.*, 715 F.3d at 1373.  When the terms to be construed are common, ordinary

11   words, claim construction involves little more than the application of widely accepted meanings

12   of those words.  *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006) (citing

13   *Phillips*, 415 F.3d at 1314).  In such cases, "dictionary definitions may establish a claim term's

14   ordinary meaning." *CCS Fitness*, 288 F.3d at 1366 (relying on McGraw-Hill Dictionary of

15   Scientific and Technical Terms to define the word "member"); *accord Rexnord Corp. v. Laitram

16   Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) (using Random House Unabridged Dictionary to

17   define the ordinary meaning of "portion").

18        As various dictionaries confirm, the plain and ordinary meanings of the terms "cell" and

19   "chamber" are broad, and simply mean a space for some purpose:

20   • **cell: "**a container for liquid during measurement or separation
        procedures such as . . . (spectro)photometry" (Wilson Decl. Ex.
21      O, Oxford Dictionary of Biochemistry and Molecular Biology
        (1997)); "3. a small compartment, cavity, or bounded space: as
22      a: one of the compartments of a honeycomb" (*id*. Ex. M,
        Webster's Collegiate Dictionary (11th ed. 2012)).
23

24   • **chamber:** "an enclosed . . . space designed for some special
        purpose" (*id*. Ex. J, Webster's Third New International
        Dictionary, Unabridged (2014)); "a small space inside
25      something" (*id*. Ex. K, Merriam-Webster Online Dictionary).

26        Nalco's proposed construction ("a bounded space containing the sample when

27   fluorescence occurs") is consistent with this plain and ordinary meaning.

28

Moreover, as detailed above, this is also in line with the intrinsic evidence, which broadly uses the concepts of "sample chamber" and "cell" to mean a space containing the sample. *See Phillips*, 415 F.3d at 1316 (citations omitted) (the specification is the best source for understanding a technical term, informed, as needed, by the prosecution history). As discussed above, every use of the term "cell" is used broadly to describe a location containing the sample. (*See* '118 Patent, 8:60-65, 2:59-62.) Nalco's definition also aligns with Turner's understanding of these terms as "something holding a sample" and an "area where sample is taken." (Wilson Decl. Ex. C, Crawford Vol. I Dep. 136:5-9; *id.* Ex. G, Brumett Dep. 128:23-25.)

### B.   "programming said fluorometer to produce an output signal proportional to the detected fluorescence"

Claim 1 also includes the limitation "programming said fluorometer to produce an output signal proportional to the detected fluorescence." ('118 Patent, 12:12-13.) The parties' proposed claim constructions for this term, as stated in the Joint Claim Construction Statement, are as follows:

| Claim Term | Nalco's Proposed Construction | Turner's Proposed Construction |
|---|---|---|
| Programming said fluorometer to produce an output signal proportional to the detected fluorescence | No construction.<br><br>Or if construction is necessary, configuring said fluorometer to produce an output signal proportional to the detected fluorescence | Inputting computer instructions into said fluorometer to cause it to produce an output proportional to the detected fluorescence |

### 1.   "Programming" is a common and ordinary word that needs no construction.

The term "programming" requires no construction. As discussed previously, claim terms do not require construction when they are "neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history." *Bd. of Trustees*, 528 F. Supp. 2d at 976.

The term programming will not be unfamiliar or confusing to a jury. Programming is a common concept with a plain meaning that a juror can understand and apply, as they likely have

1   in the context of programming a TV, a VCR, remote control, sprinklers, lights, or a variety of

2   other everyday objects.

3       General purpose dictionary definitions confirm that programming is a common term with

4   a readily understandable meaning,[3] which is to plan something to achieve a specific result.

5       Further, there is no indication in the patent or the prosecution history that the term

6   programming is used in a manner that is different from its common meaning, or in some narrow

7   or confusing technical sense.  Instead, both the patent and the prosecution history use the term (if

8   at all) in ways that are consistent with its common meaning.

9

10          **2.      The specification, claims, and prosecution history show that**
                   **"programming" has a plain and ordinary meaning.**

11      The claim language itself clearly states that programming means setting up the

12   fluorometer to produce a certain signal ("programming said fluorometer to produce an output

13   signal proportional to the detected fluorescence").  There is nothing particular or technical about

14   this term as used in the claim.  The patent relates to a solid-state fluorometer composed of

15   standard electronic components such as LEDs, photodiodes, and amplifiers - all of which only

16   require a basic set-up.  *See Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331

17   (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on

18   the language of the claims themselves, for it is that language that the patentee chose to use to

19   [claim his invention].").

20      In fact, the specification describes multiple ways to produce an output signal proportional

21   to the detected fluorescence, all of which use a simple electronic component such as an amplifier.

22   None of them involve programming a computer.  Each time the specification discusses this claim

23   limitation, it is always in the context of a broad, general set-up of an electronic device (like an

24   amplifier) to produce a certain output:

25

26      [3] **Program:** "a plan of things that are done in order to achieve a specific result." (Wilson
        Decl. Ex. K, Merriam-Webster Online Dictionary); "a plan of procedure: a schedule or system

27      under which action may be taken toward a desired goal" (*id*. Ex. O, Webster's Unabridged 1993).

28

- "The output from the photodiode is ***amplified*** to produce an output voltage proportional to the quantity of fluorescence striking the photodiode detector" ('118 Patent, Abstract (emphasis added));

- "An output from the photodiode detector 16 may be amplified by a precision FET-input ***operational amplifier*** 22 which is capable of producing an output voltage signal proportional to the quantity of fluorescence-striking the photodiode detector 16" ('118 Patent, 5:41-56 (emphasis added)).

- "In an embodiment, an amplifier is constructed and arranged to receive the signal from the detector to produce an amplified output signal" ('118 Patent, 2:62-65).

Nothing in the specification or prosecution history suggests that programming has any specific or particularized attributes, and none should be accorded. Where, as here, "programming" broadly means to set-up or configure, no claim construction is necessary. *See Renishaw*, 158 F.3d at 1250.

### 3. Turner's proposed construction improperly imports extraneous limitations into the claim.

If the Court concludes that construction is appropriate, Turner's construction is far too narrow. Although there are many types of programming, Turner suggests that programming should be narrowly construed as "inputting computer instructions." Turner makes this argument even though there is nothing in the specification to suggest that "computer instructions" must be used to produce the signal described in the claim.

Turner's proposal is not supported by the specification. The word "computer" only appears once in the specification ('118 Patent, 5:51-56), and the word "instructions" never appears anywhere in the patent. The specification's sole use of the word "computer" does not support Turner because the term computer there relates to a completely different function (controlling) rather than the claimed function (programming). All the other references to computers in the file history are even less relevant. The absence of any discussion of computer instructions in the patent is consistent with the patent's description of a solid-state fluorometer composed of electronic components such as LEDs, photodiodes, and amplifiers. These electronic components do not require any computer input to perform the functions covered by the claim.

1    As discussed previously, the specification repeatedly discusses the broad-general set up or

2    configuration of an electronic device (e.g. an amplifier) to produce a certain output.  Indeed,

3    Turner's narrowing construction would exclude most (if not all) of the embodiments described in

4    the specification because they do not use a computer (*see* '118 Patent, 5:41-56, Abstract).

5    Turner's construction takes a simple concept, used in a simple claim, and burdens it with

6    extraneous limitations.  This is not proper.  A construction should not include extraneous

7    limitations that are not supported (or even mentioned by) the specification.  *See Dorel Juvenile*

8    *Grp., Inc. v. Graco Children's Prods., Inc.*, 429 F.3d 1043, 1046 (Fed. Cir. 2005) (declining to

9    add "ease of separation" as limitation to the claim term "removably attached" when there is no

10   reference to the limitation in the specification).

11   In fact, the Federal Circuit recently considered, and rejected, an argument similar to

12   Turner's.  *See Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1349

13   (Fed. Cir. 2012) (rejecting a construction that limited "programmed" to external programming,

14   i.e. by computers).  In *Energy Transport*, defendants asserted that the District Court erred by not

15   limiting "programmed" to require that there must be external programming, such as by a

16   computer.  *Id.*  The court rejected this argument, stating that "[t]he claims [related to a

17   programmable filter] do not specify where the programming occurs, how frequently it occurs, or

18   what structure provides the programming" and "the specification gives no reason to construe the

19   claims to require that an external computer calculate the values programmed into the filter."  *Id.*

20   The court affirmed that the plain and ordinary meaning of the term "programmed" simply means

21   "provided with one or more values so as to produce a response."  *Id.* at 1349-50.

22   Further, there is no evidence here that the patentee specially redefined the term

23   "programming" to mean "inputting computer instructions."  As the Federal Circuit has explained,

24   lexicography is an "exacting" standard that requires a patentee to show "clarity, deliberateness,

25   and precision" in re-defining a claim term, for example, by using the terms "defined" or "means"

26   to indicate redefinition.  *Thorner*, 669 F.3d at 1365-66; *Renishaw*, 158 F.3d at 1249-50.  The

27   Court should not add any unnecessary verbiage or impose a limiting construction where the term

28

1   is clear and unambiguous, and the intrinsic evidence shows no deviation from plain and ordinary

2   meaning. *Johnson Worldwide*, 175 F.3d at 989-92.

3       Turner's overly narrow position has no support in the patent or the prosecution history,

4   and should not be adopted.

5           **4.      If claim construction is necessary, Nalco's construction is
                     consistent with the intrinsic evidence.**

6

7       If the Court concludes that construction is appropriate, Nalco's construction is consistent

8   with the specification and the claims.  Nalco proposes that the term "programming" should be

9   construed as "configuring," which according to dictionary definitions means to arrange or prepare

10  (something) so that it can be used.[4]

11      Nalco's proposed construction is consistent with the specification.  When describing the

12  programming function, the specification broadly describes how to arrange and construct a signal

13  proportional to the detected fluorescence, e.g., with an amplifier:

14      - "In an embodiment, an amplifier is constructed and arranged to
          receive the signal from the detector to produce an amplified
15        output signal" ('118 Patent, 2:62-65);

16      - "The output from the photodiode is amplified to produce an
          output voltage proportional to the quantity of fluorescence
17        striking the photodiode detector" ('118 Patent, Abstract);

18      - "An output from the photodiode detector 16 may be amplified
          by a precision FET-input operational amplifier 22 which is
19        capable of producing an output voltage signal proportional to
          the quantity of fluorescence-striking the photodiode detector
20        16" ('118 Patent, 5:41-45).

21      This is also consistent with the Federal Circuit's "'heavy presumption' that a claim term

22  carries its ordinary and customary meaning." *CCS Fitness*, 288 F.3d at 1366; *Aventis Pharms.*,

23  715 F.3d at 1373.  When the terms to be construed are common, ordinary words, claim

24  construction involves little more than the application of widely accepted meanings of those

25  words. *Agfa*, 451 F.3d at 1376 (citing *Phillips*, 415 F.3d at 1314).  In such cases, "dictionary

26  definitions may establish a claim term's ordinary meaning." *CCS Fitness*, 288 F.3d at 1366.

27      ────────────────
        [4] Wilson Decl. Ex. K, Merriam-Webster Online Dictionary.

28

The plain and ordinary meaning of the verb "program" means to plan something to achieve a specific result:

- **Program:** "a plan of things that are done in order to achieve a specific result." (Wilson Decl. Ex. K, Merriam-Webster Online Dictionary); "to insert or encode specific operating instructions into a machine or apparatus" (*id*. Ex. P, dictionary.com); "a plan of procedure:a schedule or system under which action may be taken toward a desired goal." (*id*. Ex. O, Webster's Unabridged 1993).

Nalco's proposed construction ("configuring said fluorometer to produce an output signal proportional to the detected fluorescence") is consistent with this plain and ordinary meaning. Nalco's proposed construction is also consistent with a Federal Circuit holding that the plain and ordinary meaning of "programming" (in a different context) is "provided with one or more values so as to produce a response." *Energy Transp.*, 697 F.3d at 1349-50.

Accordingly, if a construction is necessary, Nalco's construction should be adopted.

### C.    "emitting light having a wavelength of from about 370 nm to 500 nm"

Claim 1 describes a solid-state fluorometer that comprises, among other things, "a solid-state excitation source to direct light in a specified direction, . . . with said light emitting diode emitting light having a wavelength of from about 370 nm to about 500 nm . . . ." ('118 Patent, 11:12-19.) The parties' proposed claim constructions for this term, as stated in the Joint Claim Construction Statement, are as follows:

| Claim Term | Nalco's Proposed Construction | Turner's Proposed Construction |
|---|---|---|
| Emitting light having a wavelength of from about 370 nm to about 500 nm | No construction.<br><br>Or if construction is necessary, emitting light having a wavelength in the near-UV range | Emitting light in the entire spectrum from about 370 nm to about 500 nm. |

### 1.    The phrase "emitting light having a wavelength of from about 370 nm to about 500 nm" needs no construction.

The claim term "emitting light having a wavelength of from about 370 nm to about 500 nm" requires no construction. This term will not be "unfamiliar to the jury, [or] confusing to the

1   jury." *Bd. of Trustees*, 528 F. Supp. 2d at 976.

2       The meaning of this claim term turns on the word "about" and "from."  Both are common,

3   simple words that are undoubtedly familiar to a jury.  Common dictionaries confirm that these

4   terms have readily understandable meanings.[5]  Because "from" and "about" are words that a

5   jurors use every day, they can understand and apply it in the context of the patent without any

6   construction.  "[Claim construction] is not an obligatory exercise in redundancy."  *U.S. Surgical*,

7   103 F.3d at 1568.  In fact, these terms are so basic that a court considering a similar phrase found

8   no need to construe it.  *See Med. Research Inst. v. Bio-Engineered Supplements & Nutrition, Inc.*,

9   No. 605 CV 417, 2007 U.S. Dist. LEXIS 3576, at *9-10 (E.D. Tex. Jan. 12, 2007) (finding that

10  the term "about 50–70%" does not require construction).  Further, there is no indication in the

11  patent or prosecution history that these terms are used in a manner that is different from their

12  common meanings, or in some narrow or confusing technical sense.  Instead, both the patent and

13  the prosecution history use the term (if at all) in ways that are consistent with their common

14  meanings.

15          **2.    The specification, claims, and prosecution history show that "of**
16                 **from about 370 nm to 500 nm" should have its ordinary**
                   **meaning.**

17      The specification makes clear that this term is used to describe light in the near-UV range

18  of the spectrum, which denotes an approximate location, rather than an exact set of wavelengths:

19
20      •   "Blue LEDs operating at higher than specified forward currents
            have been found to emit a portion of their optical output in ***the***
21          ***near-UV region of the spectrum, i.e., in the range of from***
            ***about 370 nm to about 500 nm.***"  ('118 Patent, 8:19-30
22          (emphasis added).)

        The specification also makes clear that the emitted light falls somewhere within this
23
    general range of wavelengths, not that it spans the entire range.  This is consistent with the entire
24

25          [5] "**about:** almost or nearly – used to indicate that a number, amount,  time, etc. is not
26  exact or certain; reasonably close to; in the vicinity." (Wilson Decl. Ex. K, Merriam-Webster
    Online Dictionary); "approximately" (*id*. Ex. O, Webster's Unabridged 1993); "**from:**" used to
27  indicate the starting point of a physical movement or action" (*id*. Ex. K, Merriam-Webster Online
    Dictionary).

28

1   working principle of the invention, which is to select and use particular wavelengths of light to

2   excite specific molecules (i.e., fluorophores) in the industrial water.

3       In fact, the specification discusses how this technology can be used to excite any "suitable

4   fluorophore" which absorbs "in the range accessible with [] light emitting diodes." ('118 Patent,

5   9:65-10:2.)  It further discusses reasons for selecting particular wavelengths and using them to

6   excite specific molecules.  For example, it discusses how wavelengths from 380-390 nm can be

7   used to excite a PTSA fluorophore ('118 Patent, 8:29-35), and how light from a 450 nm LED

8   light source can emit a 380 nm peak wavelength.  ('118 Patent, 8:23-29.)  The specification also

9   cites a reference discussing how certain light sources are "particularly well suited" to excite

10  specific compounds, such as PTSA (450 nm), tris(2,2'-bipyridyl)ruthenium(II) chloride (470 nm),

11  and octadecyl fluorescein (460nm).  (Wilson Decl. Ex. Q.)  These examples show that the

12  claimed range is a general range of possible values from which the wavelength can be selected.

13              **3.    Turner's proposed construction improperly imports extraneous
                        limitations into the claim.**

14

15      If the Court concludes that construction is appropriate, Turner's proposed construction is

16  inconsistent with the intrinsic evidence and the basic principle of the invention.  Turner proposes

17  that the claim term should be construed as "emitting light in the entire spectrum from about 370

18  nm to about 500 nm."  But the word "entire" is not used anywhere in the specification in

19  connection with the word "spectrum."  Turner complicates an otherwise simple concept with

20  additional words ("in the entire spectrum") that have no support in the intrinsic evidence.

21      Turner's construction does not make sense in the context of this patent.  Turner's

22  construction ignores the basic principle of the claimed invention, which is to select and use

23  particular wavelengths of light to excite specific molecules so that their concentration in industrial

24  water can be measured.  "Ultimately, the interpretation to be given a term can only be determined

25  and confirmed with a full understanding of what the inventors actually invented and intended to

26  envelop with the claim."  *Elcommerce.com, Inc. v. SAP AG*, 745 F.3d 490, 499 (Fed. Cir. 2014).

27  As discussed earlier, this is why the specification discusses properties of specific wavelengths in

28  this range, and why it discusses how certain light sources are "particularly well suited" or

1   "suitable" to excite specific molecular compounds.  If the claim were construed to mean covering

2   all possible wavelengths in the entire spectrum, as Turner proposes, then these discussions in the

3   specification would be meaningless.

4           Moreover, Turner's construction is inconsistent with the language of the claim.  *See*

5   *Interactive Gift*, 256 F.3d at 1331 ("In construing claims, the analytical focus must begin and

6   remain centered on the language of the claims themselves, for it is that language that the patentee

7   chose to use to [claim his invention].").

8           Here, the claim language itself clearly says emitting light "having a wavelength" of from

9   about 370 nm to about 500 nm.  The word "a" clearly means a single wavelength, yet Turner

10  seeks to turn this phrase on its head to mean all the wavelengths in the specified region by adding

11  the word "entire", which dictionaries define as "complete or full – not lacking or leaving out any

12  part."  (Wilson Decl. Ex. K, Merriam-Webster Online Dictionary.)

13          Turner's position is also contradicted by the specification, which expressly states that the

14  emitted light is "in the range" of "from about 370 nm to 500 nm":

15          • "Blue LEDs operating at higher than specified forward currents
            have been found to emit a portion of their optical output in the
16          near-UV region of the spectrum, *i.e., in the range* of from
            about 370 nm to about 500 nm."  ('118 Patent, 8:19-30
17          (emphasis added).)

18          Being "in the range" of a spectrum is clearly different from spanning the entire spectrum.

19  Turner's construction ignores the explicit language of the specification, and in fact, directly

20  contradicts it.

21          Contrary to Federal Circuit authority, Turner's construction burdens the claim with an

22  extraneous limitation ("in the entire spectrum") that appears nowhere in the claims or the

23  specification.  As the Federal Circuit has repeatedly made clear, it is improper to add

24  "extraneous" limitations to a claim "wholly apart from any need to interpret what the patentee

25  meant by particular words or phrases in the claim."  *Hoganas*, 9 F.3d at 950; *accord Sjolund*, 847

26  F.2d at 1581; *Laitram*, 163 F.3d at 1347.  Moreover, a limitation should not be added when the

27  specification never even mentions it.  *See Dorel Juvenile*, 429 F.3d at 1046 (declining to add

28  "ease of separation" as limitation to the claim term when the specification never mentioned it).

1

**4.      If the Court finds it necessary to construe the terms, Nalco's construction is consistent with the specification.**

2

3      Even if the Court concludes that claim construction would be helpful to the jury, Nalco's

4  construction should apply.  "The construction that stays true to the claim language and most

5  naturally aligns with the patent's description of the invention will be, in the end, the correct

6  construction."  *Phillips*, 415 F.3d at 1316.

7      Nalco's construction ("emitting light in the near-UV region of the spectrum) naturally

8  aligns with the patent's description of the invention, because it is taken directly from it:

9      • "Blue LEDs operating at higher than specified forward currents
         have been found to emit a portion of their optical output in ***the***

10       ***near-UV region of the spectrum, i.e., in the range of from***
         ***about 370 nm to about 500 nm.***"  ('118 Patent, 8:19-23

11       (emphasis added).)

12     If construction is necessary, Nalco's construction is more appropriate than Turner's

13  because it retains the idea of a wavelength falling within the claimed range in the near-UV region.

14  **V.    CONCLUSION**

15     For the foregoing reasons, Nalco respectfully requests that the Court either decline to

16  construe the disputed terms, or adopt Nalco's proposed constructions.

17

18  Dated:  May 16, 2014                          MORRISON & FOERSTER LLP

19

20                                               By:   /s/ BRYAN WILSON

21                                                     Bryan Wilson

22                                               Attorneys for Plaintiff
                                                 NALCO COMPANY

23

24

25

26

27

28