1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN FRANCISCO DIVISION

11
12

NALCO CO.,

Plaintiff,

13

v.

14

TURNER DESIGNS, INC.,

15

Defendant.

16

Case No. 13-cv-02727 NC

**ORDER DENYING TURNER'S
SUMMARY JUDGMENT MOTION**

Re: Dkt. Nos. 95, 100

17
18        Turner moves for summary judgment on Nalco's patent infringement action.  Nalco's

19   patent, United States Patent No. 6,255,118, covers a method of testing industrial water

20   systems.  The Court must determine if a triable issue of material fact exists as to the

21   following issues: (1) whether Turner induced third parties to infringe Nalco's patent, (2)

22   whether Turner can be found liable for contributory infringement, and (3) whether Nalco's

23   patent is invalid due to obviousness.  Nalco alleges that Turner sells a device known as the

24   Little Dipper to customers, the use of which infringes Nalco's patented process.  The most

25   significant issue in this motion is whether or not end users that purchased the Little Dipper

26   directed or controlled certain water treatment companies to perform steps of the patent's

27   claimed method.  Without evidence of direction or control by the end user, Nalco's

28   inducement and contributory infringement claims cannot survive.

Because a reasonable jury could find that the nature of the relationship between the end user and the water treatment company establishes the element of direction or control, the Court denies Turner's motion for summary judgment on the inducement issue. And because a genuine dispute of fact exists with regard to the contributory infringement and invalidity issues—as evidenced by dueling expert testimony—the Court will deny Turner's motion for summary judgment on those issues as well. Finally, because Turner's summary judgment motion as to the '118 patent's expiration date has no impact on the underlying infringement claims, the Court will not decide that issue at this time.

## I. BACKGROUND

Turner and Nalco sell competing equipment used to test and treat industrial water systems. Dkt. No. 1 at ¶¶ 5, 9; Dkt. No. 69 at 7. On July 3, 2001, the U.S. Patent Office issued United States Patent No. 6,255,118 ("the '118 Patent") entitled "Method for Using an All Solid-state Fluorometer in Industrial Water System Applications." Dkt. No. 1 at ¶ 6. On June 13, 2013, Nalco brought a complaint for patent infringement against Turner, alleging that Turner induced infringement of the '118 patent by encouraging customers to use its products, including but not limited to the "Little Dipper," a fluorometer used to monitor chemical levels in the industrial water system, "in a manner that directly infringed, and continues to infringe the '118 patent." *See id.* at ¶ 10. Nalco also alleged that Turner committed acts of contributory infringement by developing, manufacturing, and selling the Little Dipper to customers for use in performing the patented method. *Id.* at ¶ 12.

The method of the '118 patent consists of five steps or "limitations": (a) providing the claimed fluorometer; (b) providing an industrial water system; (c) using said fluorometer to detect; (d) programming said fluorometer; and (e) controlling the dosage of treatment chemicals. *Id.* at 23.

According to Nalco, Turner did not directly infringe the '118 patent; rather, it is the end users who, by using the Little Dipper in its industrial water systems, performed the five steps of the infringing method. Dkt. No. 104-3 at 4. End users, in this case, are businesses or companies that own an industrial water system. These industrial water systems require a

water treatment system that can automatically monitor and control chemical additives.  The end users contract with water treatment companies to install and maintain their water treatment systems.  Dkt. 104-50 at ¶ 101.  This installation process includes set up and calibration of the Little Dipper.  *Id.*  Nalco argues that all of the steps are either performed directly by the end user or by the water treatment company, under the direction or control of the end user.  Dkt. No. 104-3 at 4-8.

Turner disagrees.  It asserts that step (a) and step (d) are not performed by anyone.  Dkt. No. 95-4 at 4 n.2.  However, taking the analysis put together by Nalco's expert, Dr. Vaughn Astley, as true for the purposes of the present motion, Turner argues that these two steps, in addition to steps (c) and (e), are performed by the water treatment companies.  *Id.* at 4.  For step (b), the end user provides the industrial water system.  *Id.*  The chart below summarizes the disagreement between Turner and Nalco over what entities perform which steps:

| Method of the '118 Patent | Entity or Entities Performing the Method Step according to Turner | Entity or Entities Performing Method Step according to Nalco |
| --- | --- | --- |
| (a) providing the claimed fluorometer | Water treatment company | End user or water treatment company |
| (b) providing an industrial water system | End user | End user |
| (c) using said fluorometer to detect | Water treatment company | End user |
| (d) programming said fluorometer | Water treatment company | End user or water treatment company |
| (e) controlling the dosage of treatment chemicals | Water treatment company | End user |

*See* Dkt No. 95-4 at 4; Dkt. No. 104-3 at 4-8; 14-16.

In response to Nalco's complaint, Turner brought counterclaims for declarations of non-infringement of the '118 patent and invalidity.  Dkt. No. 49 at ¶¶ 8-18.  As to its invalidity claims, Turner points to the following prior art: U.S. Pat. No. 4,992,380 ("the

1   '380 patent") titled "Continuous On-Stream Monitoring of Cooling Tower Water," which

2   was filed on October 14, 1988, and issued on February 12, 1991, and makes reference to

3   "any fluorometer."  Dkt. No. 96-8 ('380 patent at 15:5-18).  As explained later, the parties

4   disagree over how that term impacts the invalidity issue.  *See* Section III.C.ii.

5   Turner now moves for summary judgment on Nalco's claims of inducement and

6   contributory infringement.  In addition, Turner seeks summary judgment declaring the '118

7   patent invalid due to obviousness.  Finally, Turner seeks summary judgment declaring the

8   patent's expiration date to be September 23, 2016.

## II.  LEGAL STANDARD

10   Summary judgment is properly granted only where there are no genuine issues of

11   material fact and the moving party is entitled to judgment as a matter of law.  *Bubble Room,*

12   *Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998) (citing Fed. R. Civ. P. 56).  A fact

13   is material when, under governing substantive law, it could affect the outcome of the case.

14   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact

15   is genuine if the evidence is such that a reasonable jury could return a verdict for the

16   nonmoving party.  *Bubble Room*, 159 F.3d at 561 (citing *Anderson*, 477 U.S. at 247).  Bald

17   assertions that genuine issues of material fact exist are insufficient.  *Galen v. Cnty. of L.A.*,

18   477 F.3d 652, 658 (9th Cir. 2007).

19   The moving party bears the burden of establishing the absence of any genuine issue of

20   material fact.  *Bubble Room*, 159 F.3d at 561 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S.

21   144, 157 (1970); *Anderson*, 477 U.S. at 247).  Once the moving party meets its initial

22   burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or

23   discovery, set forth specific facts showing that a genuine issue of fact exists for trial.  Fed.

24   R. Civ. P. 56(c); *Ruffin v. Cnty. of L.A.*, 607 F.2d 1276, 1280 (9th Cir. 1979).  "The court

25   must afford all reasonable inferences and construe the evidence in the light most favorable

26   to the non-moving party."  *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323

27   (Fed. Cir. 2009).

28

### III.  DISCUSSION

#### A.    Inducement

Turner first argues that Nalco failed to produce evidence that Turner induced end users to infringe patent '118.  *See* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer.").  In order to find liability under a theory of inducement, the patentee must establish: (1) evidence of direct infringement, *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) ("[W]here there has been no direct infringement, there can be no inducement of infringement under § 271(b)."), and (2) that "the defendant, with knowledge of the patent, actively and knowingly aided and abetted such direct infringement." *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1366 (Fed. Cir. 2012) (citing *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc)).  To prove the second part, the patentee must show the alleged infringer "possessed specific intent to encourage another's infringement." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007).

#### i.    Direct Infringement

Direct infringement claims are governed by 35 U.S.C. § 271(a), which states, "whoever without authority makes, uses, offers to sell, or sells any patented invention … during the term of the patent therefor, infringes the patent."  A finding of direct infringement in method patent claims such as this one requires a party to perform or use each and every step or element of a claimed method. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009).

Nonetheless, in instances where more than one entity performs the steps under a patent, if a single party exercises "control or direction" over the performance of each step of the claimed method, including those it did not itself perform, it can be held liable for direct infringement. *Move, Inc. v. Real Estate Alliance Ltd.*, 709 F.3d 1117, 1122 (Fed. Cir. 2013) (citations omitted).  Thus, a successful patent holder must establish that "all steps of the process can be attributed to the controlling party, i.e. the mastermind." *Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1381 (Fed. Cir. 2010) (internal quotation marks

omitted)).

In looking at the issue of control or direction, courts have considered whether the accused direct infringer "provide[d] instructions or directions" to another entity for performing the steps, *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381-82 (Fed. Cir. 2007); "contract[ed] out steps of a patented process to another entity," *id.*; whether the direct infringer can be held vicariously liable for the actions of the other entity, *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1330 (Fed. Cir. 2008); or if a "principal-agent or like contractual relationship" operated between the parties, *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1363 (Fed. Cir. 2013) (citations omitted).

In other words, on one end of this "multiparty spectrum," one party exercises control and direction over another party to perform all of the steps; on the other end are situations where parties form mere arms-length cooperative agreements and bare no obligation to each other. R. Harmon, Patents and the Federal Circuit, § 7.2(a)(i) (11th ed. 2013).

Here, Nalco argues that the end user either performed, or controlled and directed other entities to perform, all steps of the claimed method. While the '118 patent involves five steps—or "limitations"—Turner argues Nalco failed to show that performance of at least two of those steps—limitation (a) (providing the claimed fluorometer) and limitation (d) (programming said fluorometer)—were directed or controlled by the end user.

### a.    Limitation (a)

Turner asserts that Nalco failed to establish any evidence that the end user either performed the first step of the '118 patent—"(a) providing the claimed fluorometer"—or directed or controlled the water treatment companies to perform this step.

Turner begins its analysis with the term "providing," which it construes to mean "furnishing or supplying." Dkt. No. 95-4 at 6. According to Turner, because an end user neither furnishes nor supplies the Little Dipper—and instead hires a water treatment company to supply and furnish the fluorometer on its behalf—the end user alone cannot satisfy this limitation. *Id.* at 7.

The Court disagrees that only this narrow definition applies.  In fact, the case Turner cites in support for its strict definition, *Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354 (Fed. Cir. 2012), construed the term "providing" to mean "furnishing, supplying, *making available*, or preparing[.]"  690 F.3d at 1369 (emphasis added) (finding that making a product available for use satisfies "providing" step in claimed method). There, the court held that both a frother manufacturer and an end user could meet the "providing" limitation, in part because "nothing in the claim language or patent specification limits the 'providing' step to a specific party." *Id.*

By that same token, a reasonable jury could find in this case that the end user can "make available" the fluorometer for use in the claimed method.

Still, to further illustrate that the end user cannot satisfy limitation (a), Turner claims that merely hiring the water treatment companies to provide the Little Dipper "on behalf of" the end user does not mean that the end user exercised direction or control over the water treatment company.

Turner offers two main reasons for this.  First, Turner contends that the end users do not have the "specific expertise" over servicing and maintaining use of the Little Dipper. Turner points to the testimony of Dr. Vaughn Astley, Nalco's expert.  Dkt. No. 110-5 at 2. Dr. Astley wrote in his expert report that because end users may lack the "specific expertise" to install, maintain, and service their own water treatment systems, they hire water treatment companies to do it for them.  Dkt. 104-50 at ¶ 101.  In other words, Turner asks: How can the end users direct or control the water treatment companies to apply use of the Little Dipper in their water treatment systems, without the expertise necessary to do it themselves?  It's a fair question.  Turner, however, does not cite any authority that states "specific expertise" on a subject is a necessary condition for a party to direct or control another.

Second, Turner states that because no agency or joint venture relationship existed between the parties in this divided infringement case, the end user in no way directed or controlled the water treatment companies as a matter of law.  *See* Dkt. No. 95-4 at 9 (citing

*Aristocrat*, 709 F.3d at 1363).  But while *Aristocrat* did find that vicarious liability between two parties could not exist, absent an agency relationship or joint enterprise, the court also held that "[o]ne party's direction or control over another in a principal-agent relationship or *like contractual relationship* operates as an exception to [the] general rule [that a single actor must perform every step of the claimed method] . . . .  *Aristocrat*, 709 F.3d at 1363 (emphasis added) (citations omitted).

Thus, while both Nalco and Turner acknowledge a contract exists between the end user and the water treatment company, the key question that arises is not whether "on behalf of" is tantamount to "direction or control" as Turner suggests, but rather: Can the nature of the relationship between the parties be characterized as one of principal and agent or like contractual relationship?

The Court is not convinced that Turner has resolved this question.  The cases that Turner cites for the proposition that no direction or control exists are all distinguishable: none involve ongoing obligations under contract.  For instance, in *Joao Control & Monitoring Sys. of California, LLC v. Sling Media, Inc.*, No. 11-cv-06277 EMC, 2012 WL 3249510 (N.D. Cal. Aug. 7, 2012), the court dismissed the direct infringement claim because the defendant's customers had no obligation to do anything under the alleged infringer's control.  2012 WL 3249510 at *6 ("[S]uch direction or control only arises when the parties form an agency relationship or other contractual obligation to perform the steps.") (internal quotation marks and citation omitted).  Similarly, in *Aristocrat*, the court found no agency relationship existed between a casino and players; players have no obligations to the casino nor do they "act[] on behalf of" the casino when they use its slot machines.  *Aristocrat*, 709 F.3d at 1362.  The patentee in *BMC*, which, unlike here, involved more than two alleged infringing parties, also did not establish that the alleged infringer provided instruction or direction regarding the use of financial data it passed on to third party debit networks that allegedly performed one step of the claimed method.  498 F.3d at 1381.  Furthermore, the *BMC* patentee did not provide evidence of any contractual relationship between the alleged infringer and yet another party—financial institutions that

1   allegedly performed another step. *Id.* at 1382.

2       Here, there exists an ongoing contractual relationship between end users and the

3   water treatment companies.  Unlike in *Joao* or *Aristocrat*, where the court found no

4   obligations between the parties, the water treatment companies have an ongoing contractual

5   obligation to the end user to provide certain products and services.  For instance, in addition

6   to setting up the Little Dipper for the end user Americold Logistics, water treatment

7   company Garratt-Callahan also possessed a contractual obligation to "make periodic calls to

8   [Americold's] facility, during which time [it would] perform all pertinent analyses [of]

9   treated water systems and make recommendations . . . in order to make [] treatment

10  operation successful."  Dkt. No. 104-35.  In exchange for these services, the contract

11  obligated Americold to make 36 monthly payments to Garratt-Callahan of $824.00.  *Id.*

12      Furthermore, in contrast to the facts in *BMC*, Nalco provides evidence of contractual

13  agreements that a reasonable jury may find constitutes a principal-agency or like contractual

14  relationship.  Indeed, the water treatment company enters the end user's premises to make

15  available the Little Dipper—limitation (a)—and make periodic calls to the end user's

16  facility regarding operation of their water treatment system.  A reasonable jury could

17  certainly conclude that the end user "contract[ed] out steps of a patented process to another

18  entity," *BMC*, 498 F.3d at 1381, namely the step of providing the Little Dipper to the end

19  user on the end user's property.  And at least one contract includes an indemnification

20  clause.  In the contract between end user Idaho Milk and water treatment company

21  ChemTreat, the indemnification clause states, "Customer shall assume all responsibility for

22  injury or damage to Customer or others based on or arising out of the possession[,] handling

23  or use by Customer or by others of the Equipment and Products purchase[d] from

24  ChemTreat for any purpose whatsoever . . . ."  Dkt. No. 104-36.  From this, a reasonable

25  jury could find that the end-user Idaho Milk, agreed to be held vicariously liable for injuries

26  that result from actions by ChemTreat, which includes handling and use of the Little

27  Dipper.  *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1330 (Fed. Cir. 2008) ("[T]he

28  control or direction standard is satisfied in situations where the law would traditionally hold

1  the accused direct infringer vicariously liable for the acts committed by another party that

2  are required to complete performance of a claimed method.") (citing *BMC*, 498 F.3d at

3  1379).

4      In sum, "[a] party cannot avoid infringement . . . simply by contracting out steps of a

5  patented process to another entity." *BMC*, 498 F.3d at 1381. "In those cases, the party in

6  control would be liable for direct infringement." *Id.* In this case, a genuine dispute of

7  material fact exists over whether the contractual relationship between the end user and the

8  water treatment companies, and the obligations that spring from that relationship, can

9  establish direction or control.

10      The Court concludes that a reasonable jury could find that some end users satisfy

11  limitation (a) through performance, using the definition of "providing" in *Meyer*. At the

12  very least, a reasonable jury could conclude that the end user contracted out limitation (a) of

13  the '118 patent to the water treatment company, and, in doing so, retained direction or

14  control over performance of that step.

15              **b.**    **Limitation (d)**

16      Turner argues that the end users did not perform limitation (d) of the '118 patent:

17  "programming said fluorometer."

18      Nalco contends that end users "necessarily perform the programming step when they

19  calibrate the Little Dipper." Dkt. No. 104-3 at 15. However, from the infringement charts

20  in Section II.D. of its brief, Nalco appears to concede that the end user does not directly

21  perform this step; rather limitation (d) is "[c]arried out by [the water treatment company] on

22  [the end user's] behalf during set up." Dkt. No. 104-3 at 5-8.

23      Therefore, the main issue is whether or not the end users controlled or directed the

24  water treatment companies to perform this "programing" step. Just like its stance on

25  limitation (a), Turner believes there is no evidence that an end user directed or controlled a

26  water treatment company to program the Little Dipper. According to Turner, not only does

27  the end user lack the know-how to program the Little Dipper, there is not a "shred of

28  evidence" of a "principal-agent or like contractual relationship" between any end user and

1  any water treatment company.  Dkt. No. 110-5 at 7.

2       For the same reasons discussed above in Section III.A.i.a.—namely, that a genuine

3  issue of material fact exists as to whether the end users' ongoing contractual relationship

4  with the water treatment companies and the obligations that stem from that relationship

5  establish direction or control—the Court finds that a reasonable jury could conclude that

6  limitation (d) was performed by the water treatment company at the direction or control of

7  the end user.

8              **ii.    Little Dipper Sales to Unidentified End Users**

9       Turner urges the Court to grant it summary judgment of no infringement with regard

10 to all Little Dipper sales for which Nalco offered no evidence.  Turner states that proof of

11 direction or control "necessarily requires particularized proof, and cannot be inferred from

12 four examples."  Dkt. No. 110-5 at 1.  In other words evidence of direct infringement by

13 Americold, AMVAC, Idaho Milk, or MLK, cannot serve as circumstantial evidence of

14 direct infringement by other unidentified end users who similarly purchased the Little

15 Dipper.

16      In support of its position, Turner cites to *Cardiac Pacemakers Inc. v. St. Jude*

17 *Medical, Inc.*, 576 F.3d 1348 (Fed. Cir. 2009), which "affirm[ed] the [district] court's

18 decision limiting damages to those devices that can be shown to have executed the steps of

19 claim 4 of the '288 patent."  576 F.3d at 1351 (affirming *Cardiac Pacemakers, Inc. v. St.*

20 *Jude Med., Inc.*, 418 F. Supp. 2d 1021 (S.D. Ind. 2006)).  It held that because "only a

21 method claim is at issue . . . [the alleged infringer] stands to benefit from limiting damages

22 to devices that actually practice the method."  *Id.* at 1358.  At first glance, the case stands

23 for the proposition that damages for method infringement cases must be limited to only

24 those devices that the patentee demonstrates *actually practiced the method*.  The Court

25 disagrees.

26      In *Cardiac*, the patentees made infringement claims concerning a method that

27 evaluated and treated abnormal rhythms of a patient's heart using an implantable cardiac

28 defibrillator.  *Cardiac*, 418 F. Supp. 2d at 1024.  In a "multimode" operation, the device can

1  respond to abnormal heart rhythms by administering different types of electrical shocks or

2  therapies.  *Id.*  A physician must program the device to perform the type of therapy before

3  implantation.  The specific claim involved a method for "cardioversion," a form of therapy

4  administered by the implantable cardiac defibrillators.  *Id.*  Notably, the patentee chose not

5  to pursue infringement claims for methods relating to "cardiac pacing" or "automatic

6  defibrillation"—the most common forms of therapy.  *Id.* at 1040.

7      The alleged infringer argued that infringement of the claimed method required a

8  showing that its devices were either "actually programmed" to execute the claimed method

9  for cardioversion or that it "actually executed" the method.  *Id.* at 1039.  In its defense, the

10  alleged infringer introduced evidence that doctors programmed a number of its implanted

11  devices to "DEFIB ONLY" mode, "making them incapable of executing a separate

12  'cardioversion' therapy unless and until they were reprogrammed."  *Id.* at 1040.

13      The court in *Cardiac* held the patentee could not recover for sales of devices "merely

14  capable of infringing."  *Id.* (citation omitted).  For that particular method claim, which

15  hinged on programming the device a certain way before implantation, there can be no

16  infringement "unless the patented method is *actually practiced*."  *Id.* at 1041(emphasis in

17  original).

18      In other words, under *Cardiac*, a device that can be programmed in several different

19  ways to perform various methods—including common non-infringing methods—does not

20  infringe a claimed method, unless it is specifically performed or was programmed to

21  perform the infringing method.

22      Here, in contrast, Nalco presents evidence that Little Dipper purchases by end users

23  inevitably led to performance of the infringed method.  While the *Cardiac* plaintiff believed

24  it could recover damages for devices with the potential or capability to execute the claimed

25  method, even if the device does not actually perform claimed method, Nalco makes no such

26  argument.  Accordingly, *Cardiac's* requirement that the patented method must have been

27  actually practiced to find infringement does not apply here.

28      The Court does agree with Turner that determining whether or not the end users

Case No. 13-cv-02727 NC
ORDER DENYING SUMMARY          12
JUDGMENT

directly infringed the '118 patent requires a fact-specific inquiry.  Though it disagrees with Nalco's conclusions, Turner appears to concede that Nalco engaged in such an inquiry with regard to end users Americold, AMVAC, Idaho Milk, and MLK.  The question then becomes: Must Nalco produce additional direct evidence of infringement, and engage in multiple fact-specific inquiries, beyond the four examples it already provided, to find infringement by unnamed end users?  No.

The Federal Circuit has upheld claims of infringement based on circumstantial evidence of direct infringement by unidentified parties.  *E.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009) ("[T]he jury in the present case would have reasonably concluded that, sometime during the relevant period from 2003 to 2006, more likely than not one person somewhere in the United States had performed the claimed method using the Microsoft products."); *see also Interwoven, Inc. v. Vertical Computer Sys.*, No. 10-cv-04645 RS, 2014 U.S. Dist. LEXIS 13902, *5 (N.D. Cal. Feb. 3, 2014) ("[A] finding of infringement can rest on as little as one instance of the claimed method being performed during the pertinent time period.") (quoting *Lucent*, 580 F.3d at 1317); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("[i]t is hornbook law that direct evidence of a fact is not necessary" to meet a party's burden of proof on an issue of fact).  Indeed, the evidence in *Lucent* consisted of the defendant's sales of the allegedly infringed product, the defendant's dissemination of instruction manuals with its products, and testimony from the patentee's expert that "[i]t's hard to imagine" that the expert and his wife were the only two individuals to ever use the accused functionality.  580 F.3d at 1317-19.  Nonetheless, the Federal Circuit concluded that this circumstantial evidence supported the jury's verdict of infringement.  *Id.*

In this case, Nalco presented evidence concerning not one, but four instances of direct infringement of the '118 patent.  The Court rejects Turner's position that Nalco must produce separate evidence for every single sale of the Little Dipper to unnamed parties to find liability.  Dr. Astley testified that all other customers use the Little Dipper in the same way as the four identified entities.  Dkt. No. 104-50 ¶¶ 62-102.  A reasonable jury could

1   find that the four identified instances of direct infringement could serve as circumstantial

2   evidence of infringement by other end users.

3          **iii.    Specific Intent**

4          To succeed on a claim of inducement under 271(b), the plaintiff must also

5   demonstrate that the defendant possessed not just knowledge of the possible infringement,

6   but also specific intent to encourage another's infringement. *ACCO Brands*, 501 F.3d at

7   1312. In turn, specific intent requires a showing that the alleged infringer's actions

8   "induced infringing acts and that he knew or should have known his actions would induce

9   actual infringements." *Id.* (internal quotation marks and citation omitted). A good faith

10  belief that the induced acts do not constitute infringement or that the patent is invalid can

11  negate specific intent. *Commil USA, LLC v. Cisco Sys.*, 720 F.3d 1361, 1368 (Fed. Cir.

12  2013); *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1351 (Fed. Cir. 2009).

13         Whether or not an alleged infringer acted in good faith is a "quintessential issue of

14  fact." *EveryScape, Inc. v. Adobe Systems, Inc.*, 2014 WL 4261406, *2 (D. Mass. Aug. 27,

15  2014) (accused infringer's alleged good faith belief not sufficient for summary judgment).

16  Thus, "[t]he drawing of inferences, particularly in respect of an intent-implicating question

17  . . . is peculiarly within the province of the fact finder that observed the witnesses." *Rolls-*

18  *Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986); *see also Fuji*

19  *Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (declining to

20  disturb jury's verdict because intent to induce infringement "is a factual determination

21  particularly within the province of the trier of fact").

22         Even the cases that Turner cites agree: *Commil* and *Ecolab* both involve post-trial

23  motions where the Federal Circuit held that the fact finder should answer the question of

24  intent to induce; not cases where the court found inducement foreclosed as a matter of law.

25  *See Commil*, 720 F.3d at 1368-69; *Ecolab*, 596 F.3d at 1351. Moreover, on this question of

26  intent, the Federal Circuit has made clear that juries can rely on circumstantial evidence.

27  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) ("While proof of intent

28  is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.")

1   (internal quotation marks and citation omitted).

2       Here, Turner argues it had a good faith belief that the Little Dipper could not be used

3   to practice the method of the '118 patent.  Dkt. No. 95-4 at 17.  Turner presents evidence

4   that it believed the Little Dipper lacked a "sample chamber which is a cell" or flow cell,

5   which it deemed a sufficient distinction to avoid a patent infringement.  Turner

6   communicated the lack of this feature to customers and potential customers when concerns

7   over infringement of the '118 patent arose.  *See* Dkt. No. 104-13.

8       Indeed, Turner's case for good faith relies in a large part on evidence of its

9   communications with customers.  This includes emails written by Tom Brumett, a Turner

10  Sales Engineer and a customer contact.  For instance, in an email to a potential customer

11  considering use of another competitor's fluorometer, Brumett stated that using the other

12  competitive product "would put you and your customers at risk for violating Nalco's patent

13  6,255,118."  Brumett continued:

14      The difference between this product and the Little Dipper is that the new product
        incorporates a sample chamber directly into the fluorometer while the sample
15      chamber for the Little Dipper is external to the instrument.  While this may seem an
        insignificant distinction, in our opinion it is the difference between violating the
16      patent and avoiding violation.
17

18  Dkt. No.  99 at 9.  In another customer email, Brumett stated that "Turner Designs has

19  produced the Little Dipper as a potential way to avoid a patent infringement since it does

20  not use a flow cell."  *Id.* at 2.

21      Despite the definitive tone of these emails and the assertion that infringement turns on

22  presence of a flow cell, Brumett never once looked up the definition of "flow cell," never

23  bothered to read the '118 patent all the way through, and failed to consult an attorney on

24  such claim terms before sending out the emails.  *See* Dkt. No. 104-13.  And as Nalco points

25  out, Brumett even admitted, "reasonable minds could differ" on the meaning of "cell" in the

26  patent's context.  *See id.*

27      Taking this evidence in the light most favorable to Nalco, the evidence of Turner's

28

failure to thoroughly analyze the infringement issue before discussing it with potential new customers—who were considering alternatives to the Little Dipper—could lead a reasonable jury to find that Turner did not possess a good faith belief of non-infringement. *See Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 2013 WL 4458754, *7 (D. Nev. Aug. 16, 2013) (upholding jury's finding that defendant did not have good-faith belief of invalidity because it "conducted a very limited analysis").

**B.    Contributory Infringement**

**i.    Substantial Non-Infringing Use**

Claims for contributory infringement are made under 35 U.S.C. § 271(c), which states: "Whoever offers to sell or sells . . . a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process . . . shall be liable as a contributory infringer." 35 U.S.C. § 271(c).

In addition to proving direct infringement, claims under this section require the patentee to show that the defendant "knew that the combination for which its components were especially made was both patented and infringing and that defendant's components have no substantial non-infringing uses." *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005) (internal quotation marks and citation omitted). A non-infringing use is substantial when it is "not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009). "The existence of substantial non-fringing uses . . . defeats [a] claim for contributory infringement as a matter of law." *Id.* at 1328 (citing 35 U.S.C. § 271(c)).

Turner identifies the existence of such a use in an attempt to defeat Nalco's contributory infringement claim. In its opening brief, Turner identifies use of the NT model of the Little Dipper "without a mounting tee" as a substantial non-infringing use. Dkt. No. 95-4 at 18. After all, without a mounting tee, the Little Dipper cannot practice limitation (a)(iii) of the "providing the claimed fluorometer" step. *Id.* Yet as Nalco points out, Turner admits that customers who purchase the NT models end up supplying their own custom tees

for use with the NT Model. *See* Dkt. 104-13 at 11, 18-20. In fact, Dr. Astley states that some customers supply and use their own tee, Dkt. No. 104-50 at ¶¶ 75-78 and 154, while others never use the Little Dipper without a tee, Dkt. No. 104-18 at 20; Dkt. No. 104-19 at 6-7. A reasonable jury can easily find use of the Little Dipper in this way "unusual," "illusory," and "impractical." *See Vita-Mix*, 581 F.3d at 1327.

And while Turner asserts that the Little Dipper is used in monitoring installations for leak detection—that is, the fluorometer is not used to control dosages of chemical treatments as described in limitation (e)—Turner offers no specific examples of this in the record, other than the conclusory statement itself. *See* Dkt. No. 95-4 at 18; Dkt. No. 95-5 at ¶ 49 ("Little Dipper is installed by some end users for leak detection"). Given testimony from Dr. Astley that "there are no substantial non-infringing uses," a genuine issue of material fact exists. *See* Dkt. No. 104-50 at ¶ 154-57 (internal quotation marks omitted).

Despite only providing at most two examples of substantial-non-infringing use in its opening brief, Turner adds another in its reply brief: a version of the Little Dipper known as the "Enviro-T" is used to measure "the level of algae in natural water such as municipal water systems." Dkt. No. 110-5 (quoting Dkt. No. 110-16 (Declaration of James Crawford in Support of Turner's Reply in Support of Summary Judgment)). This means that the Enviro-T may have substantial non-infringing uses—it is "not marketed for use, and is not used, in industrial water systems." Dkt. No. 110-16 ¶ 3.

Shortly thereafter, Nalco objected to the evidence relating to the Enviro-T because it constitutes new evidence raised for the first time in Turner's reply brief (and supporting declarations) to support a new theory of non-infringement as well as invalidity. Dkt. No. 113-3 at 1. According to Nalco, this violates Local Rule 7-3(d)(1), as well as Rules 26(a) and (e) of the Federal Rules of Civil Procedure for failure to disclose in response to Nalco's contention interrogatories. *Id.* Nalco requests that the Court exclude this evidence. *See* Fed. R. Civ. P. 37(c)(1) (failure to comply with obligations under 26(a) or (e) precludes party from "us[ing] that information . . . to supply evidence on a motion, at a hearing or at trial, unless the failure was substantially justified or is harmless").

To be sure, the Court notes that Turner failed to disclose in discovery the evidence that the Enviro-T is another version of the Little Dipper with substantial non-infringing uses. In a contention interrogatory, Nalco asked Turner a straightforward question: "If you contend that the Little Dipper has non-infringing uses, please describe them." Dkt. No. 104-11. While Turner mentions "leak detection" and "reverse osmosis systems," its answer makes absolutely no reference to the Enviro-T or to use of the Little Dipper to measure algae levels in municipal water systems. *Id.* Likewise, its supplemental response to that same interrogatory failed to do so as well. Dkt. No. 104-12. Nonetheless, the Court will not grant Nalco's request to strike Turner's allegedly new evidence.

However, the Court denies summary judgment to Turner on Nalco's contributory infringement claim because of inconsistencies in Turner's statements regarding the Enviro-T; this raises a genuine dispute of fact over whether the Enviro-T can satisfy the definition of a substantial non-infringing use of the Little Dipper. Turner now claims that the Enviro-T is "physically identical to other versions of the Little Dipper," Dkt. No. 110-16 ¶ 4-6, and that the only difference between the two is "simply which LED you put in," Dkt. No. 124 at 32-33. But in an earlier deposition, Nalco asked Turner sales engineer Brumett whether the Enviro-T is the same as or different from the Little Dipper. Dkt. No. 113-6 at 54-55. Brumett responded, "The electronics are the same; the optics are different." *Id.* Indeed, he stated the Enviro-T had a different LED, a different excitation filter, and a different emission filter. *Id.*

Similarly, Turner now offers a declaration from Turner CEO James Crawford asserting that the Enviro-T is a version of the Little Dipper. Dkt. No. 110-16. Yet when Nalco asked Crawford during his deposition whether Turner ever made documents publicly available on its website, manual, or in other materials that referred to the Enviro-T as a Little Dipper, Crawford responded "no." Dkt. No. 113-7 at 4. Indeed, Turner admitted in the summary judgment motion hearing that the Enviro-T and the Little Dipper are not substitutes for one another. Dkt. No. 124 at 31-32.

A reasonable jury may also decide that the Enviro-T does not constitute a substantial

non-infringing use on the basis of its sales numbers. While there have been nearly 2,000 sales of the Little Dipper according to Nalco and Turner, Dkt. No. 124 at 58, 68, and 72, Turner made only 10 sales of the Enviro-T to eight different customers, Dkt. No. 110-16 at 2.

Looking at all of Turner's statements regarding the Enviro-T in a light most favorable to the nonmoving party, a reasonable jury could find that the Enviro-T differs enough from the Little Dipper in such a way that it cannot serve as a substantial non-infringing use.

**C.    Invalidity**

A patent is invalid as obvious under Section 103 "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). In general, "a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012) (citing *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (internal quotation marks omitted)). A court may decide the issue of obviousness on summary judgment. *Sentius Int'l, LLC v. Microsoft Corp.*, No. 13-cv-00825 PSG, 2014 U.S. Dist. LEXIS 113917, *18 (N.D. Cal. Aug. 15, 2014) ("Although obviousness is a question of law predicated on underlying questions of fact, it may be decided on summary judgment.") (internal quotation marks and citation omitted).

Whether a patent claim is obvious is a question of law based on four underlying facts: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and (4) objective considerations of nonobviousness. *Cyclobenzaprine*, 676 F.3d at 1068-69 (Fed. Cir. 2012) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

### i.   Scope and Content of Prior Art

Turner contends that the specification of the '118 patent itself admits that the only advance it made to the prior art was combining two known elements: (1) a prior art solid state fluorometer with (2) a prior art system for monitoring and controlling chemicals in industrial water systems.

At the outset, the Court notes the parties' experts dispute the extent to which the '118 patent specification's description of these two factors renders the invention obvious. *Compare* Dkt. No. 95-5 at ¶¶ 50-56 (opinion by Turner's expert witness Dr. Larry Russell) *with* Dkt. No. 104-54 at ¶¶ 111-169 (opinion by Nalco's expert witness Dr. Astley). For instance, Dr. Astley states that a patent may be obvious if a combination of known elements, by known methods, yield a predictable result. Dkt. No. 104-54 at ¶ 113. But because the technical challenges involved with applying an all solid-state fluorometer to monitor and control treatment chemicals in industrial water systems had not yet been solved at the time of the prior art, the method for combining these elements could not been known, much less have led to predictable results. *Id.* at ¶¶ 114-120. Viewed in a light most favorable to Nalco, a reasonable trier of fact could conclude there is not enough clear and convincing evidence supporting Turner's position.

Additionally, Turner highlights the "invention story" surrounding the '118 patent, which it argues "confirms obviousness as a matter of law." Dkt. No. 95-4 at 20. Turner points to deposition testimony from inventor Martin Godfrey, who recalled that another co-inventor, James Whitten, attended an American Chemical Society meeting. At that meeting, according to Turner's reading of the testimony, "existing solid-state fluorometers were discussed. On this [sic] return to Nalco, he and Alfano built a solid-state fluorometer like that seen at ACS by investor Whitten." Dkt. No. 95-4 at 20 (citing Godfrey's deposition testimony).

However, a look at the actual testimony reveals something else entirely: Whitten attended a presentation "about diode lasers." Dkt. 104-40 at 33:11-15. In fact, Godfrey "[does not] remember Dr. Whitten saying that the presentation at the ACS meeting involved

any type of flurometry[.]" Dkt. No. 104-60.  A reasonable jury could conclude that Turner's characterization of the "invention story," in which one of the inventors attended a conference presentation on prior art solid-state fluorometers, is not supported by clear and convincing evidence.

### ii.   Differences Between Claims and the Prior Art

Turner claims that the combination of the '380 patent and the specification of the '118 patent renders the claimed invention obvious.  However, Turner also concedes that the '380 patent does not explicitly disclose use of a solid-state fluorometer.  In fact, the '380 patent states "[i]n general, any fluorometer, with a large pathlength, and excitation and detection in the ultraviolet (UV) light region could be employed."  Dkt. No. 96-8 ('380 patent at 15:5-18).

Still, the experts disagree over the impact of the reference to "any fluorometer." Turner's expert, Dr. Russell, believes the term can be understood as teaching the claimed solid state fluorometer.  Dkt. No. 95-5 at ¶ 62.  Conversely, Dr. Astley contends that such a person would not have understood the reference to include solid-state fluorometers that did not exist at the time.  Dkt. No. 104-54 at ¶¶ 59-61.

### iii.   Level of Ordinary Skill in Pertinent Art and Motivation to Combine

With this factor, the Court must look to whether a person of ordinary skill in the art would have been motivated to combine certain prior art references.  *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1353 (Fed. Cir. 2013) (citation and quotes omitted).  Motivation to combine may be found in "market forces; design incentives; the interrelated teachings of multiple patents; any need or problem known in the field of endeavor at the time of invention and addressed by the patent; and the background knowledge, creativity, and common sense of the person of ordinary skill."  *Id.* at 1354 (internal quotation marks and citations omitted).

Here, once again, the experts disagree.  Dr. Russell contends a skilled artisan would be motivated to combine the '380 patent with elements identified in the '118 patent—doing so would "achieve predictable results without undue experimentation."  Dkt. No. 95-5 at ¶

106.  To Turner, the invention of '118 patent involved "a simple matter of buying components at the local Radio Shack and assembling and testing them, since the inventors knew that lasers and LEDs 'were a great fit' . . . ." Dkt. No. 110-5 at 14.  On the other hand, Dr. Astley takes the opposite view, finding it was unknown at the time of the '118 patent invention whether an LED could be used as an excitation source in industrial water systems.  Dkt. No. 104-54 at ¶ 116.

### iv.   Objective Considerations of Nonobviousness

The Federal Circuit has "consistently pronounced that all evidence pertaining to the objective indicia of nonobviousness must be considered before reaching an obviousness conclusion." *Plantronics*, 724 F.3d at 1355 (citation omitted).  Examples of objective considerations include "commercial success, long felt but unsolved needs, [and] failure of others . . . ." *Id.* at 1353 (citation and internal quotation marks omitted).

In this case, Turner only focuses on the consideration of commercial success.  It concluded, "There are no relevant secondary considerations to consider, and the '118 patent is obvious over the '380 patent." Dkt. No. 95-4 at 24.  This hardly meets the clear and convincing standard.  In fact, Dr. Astley talks about at least five examples of other objective indicia of nonobviousness: (1) the industry's need for a more compact, less expensive, and more reliable fluorometer for industrial water system applications; (2) Nalco proceeded contrary to accepted wisdom in the field; (3) experts and other skilled artisans expressed surprise at Nalco's invention; (4) copying by others; and (5) praise Nalco received for its invention. Dkt. No. 104-54 at ¶¶ 142-169.

Having looked at the scope of the '118 specification, how it compares to the prior art, as well as whether a skilled artisan would have a motivation to combine, and, in light of the disputing expert opinions, a reasonable fact finder may conclude Turner has not presented clear and convincing evidence that the '118 is invalid because of obviousness.

### D.   '118 Patent Expiration Date

Finally, Turner seeks summary judgment regarding the expiration date of the '118 patent.  Both Turner and Nalco agree that the face page and specification of the '118 patent

claim priority to application No. 08/719,507 filed on September 23, 1996. *See* Dkt. No. 1 at 18. Under 35 U.S.C. § 154(a)(2), the term of the patent is for 20 years beginning on the date that patent was issued. 35 U.S.C. § 154(a)(2). However, if a patent application contains a specific reference to an earlier filed application to which priority is claimed, the 20-year term of the patent starts on the filing date of the earliest application. *Id.*

Here, the '118 patent claims priority over two applications: application No. 08/719,507 and application No. 08/873,046, which was filed on June 11, 1997. Nalco sought to disclaim the earlier 1996 patent application, telling the PTO that its claim of priority as was an error. *See* Dkt. No. 96-10 at 2; Dkt. No. 104-42 at 3. Despite the fact that the PTO's PAIR website correctly stated prior information for the '118 patent—that is, the cross-reference in the patent is only to the 1997 patent application—the issued patent continued to not reflect the amendment. Dkt. No. 104-41 at 2.

Accordingly, Nalco filed a Request for Certificate of Correction with the PTO. Dkt. No. 104-42 at 2. Indeed, 35 U.S.C. § 254 authorizes correction certificates "whenever a mistake in a patent, incurred through the fault of the Patent and Trademark Office, is clearly disclosed by the record of the Office." 35 U.S.C. § 254. Thus, Nalco argues that the correct expiration date should be June 11, 2017, or 20 years after the 1997 patent application.

Nonetheless, according to Turner, under 35 U.S.C. 154(a)(2), the '118 patent term should expire on September 23, 2016, or 20 years after the filing of the earlier 1996 patent application. Turner contends that Nalco is wrong because, under *Southwest Software, Inc. v. Harlequin, Inc.*, 226 F.3d 1280 (Fed. Cir. 2000), "for causes arising before its issuance, the certificate of correction is not effective." 226 F.3d at 1295 (citing 35 U.S.C. § 254). In other words, because the certificate of correction was filed after Nalco's lawsuit, any corrections on the patent that would impact the expiration date of the '118 patent should not apply. Therefore, Turner believes it is entitled to summary judgment that the '118 patent expires on September 23, 2016.

On the contrary, *Southwest Software* does not support this position. There, after the

patentee filed the lawsuit, the accused infringers noted that the patent was missing a "Program Printout Appendix containing PostScript code for the calibration feature of the invention." *Id.* at 1287.  The patentee promptly requested that the PTO issue a certificate of correction under 35 U.S.C. § 254.  *Id.*  The PTO issued the certificate, adding the "Program Printout Appendix" to the patent.  *Id.*  The alleged infringers moved for summary judgment, arguing that the certificate was invalid, and even if validly issued, did not apply to the case, because under 35 U.S.C. § 254, a certificate of correction is effective only for causes of action arising after issue.  *Id.* at 1293-94.  According to the alleged infringers, because the patentee filed its lawsuit in 1995, and the PTO did not issue the certificate of correction until 1997, the certificate had no effect.  *Id.*  The patentee responded that the certificate of correction should be treated as if it were effective on the day the patent issued; any other result would nullify the language of 35 U.S.C. § 254 that "such certificate shall be considered as part of the original patent."  *Id.*

The Federal Circuit found against the patentee and held that the certificate of correction was not effective as to a cause of action arising before the certificate was issued. *Id.* at 1297.  The court explained that "where the claim is invalid on its face without the certificate of correction, it strikes us as an illogical result to allow the patent holder, once the certificate of correction has issued, to sue an alleged infringer for activities that occurred before the issuance of the certificate of correction."  *Id.* at 1295-96; *see also Urologix, Inc. v. ProstaLund AB*, 256 F. Supp. 2d 911, 915 (E.D. Wis. 2003) ("A certificate of correction issued to remedy a failure of copendency, for example, has no effect in a lawsuit filed before the certificate issued.") (citations omitted); *but see SDS USA Inc. v. Ken Specialties Inc.*, 122 F. Supp. 2d 533, 547 (D.N.J. 2000) (finding *Southwest Software* inapplicable because patentee's complaint filed well after certificate of correction issued).

Here, unlike in *Southwest Software*, the basis for Nalco's causes of action for infringement does not turn on the PTO's issuance of a certificate of correction.  Put another way, whether the '118 patent cross references the 1996 application or the 1997 application—which, in turn, determines if the patent expires in 2016 or 2017—does not at

this point impact Nalco's lawsuit or the validity of Nalco's patented method.  This Court can decide to consider the certificate of correction or it could not; either way, it does not negate the underlying causes of action for infringement.  Conversely, in cases like *Southwest Software*, the patentee's claim actually appeared invalid without application of the certificate of correction.

Because Turner's motion for summary judgment as to the '118 patent's expiration date has no bearing on the underlying infringement and validity issues, this Court will not rule on this motion at this time.  *See, e.g., INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

## IV.  CONCLUSION

In short, because a reasonable jury could find that the end users and the water treatment companies formed a principal-agent or like contractual relationship that established the element of direction or control, the Court denies Turner's summary judgment motion on induced infringement.  The Court denies Turner's motion for summary judgment on contributory infringement because a genuine dispute of fact still exists over whether there is a substantial non-infringing use of the Little Dipper.  And as evidenced by dueling expert testimony, a genuine dispute of fact exists over the issue of obviousness, and the Court will deny Turner's motion for summary judgment that the '118 patent is invalid.  Finally, because Turner's summary judgment motion regarding the '118 patent's expiration date has no impact on the underlying infringement claims, the Court will not decide the issue at this time.

IT IS SO ORDERED.

Date:  October 17, 2014

_____
Nathanael M. Cousins
United States Magistrate Judge